**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 21cv2040

THE KONG COMPANY, LLC, a Colorado
limited liability company,

         Plaintiff,

v.

PICCARD MEDS FOR PETS CORP, a
Florida corporation, MARLON MARTINEZ,
a natural person, and JOHN DOES 1-10,
individually or as corporate/business entities,

         Defendants.

---

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND OTHER RELIEF
FOR VIOLATIONS OF 15 U.S.C. § 1114; 15 U.S.C. § 1125; C.R.S. § 6-1-105;
TORTIOUS INTERFERENCE; AND RELATED CLAIMS; AND JURY DEMAND**

---

Plaintiff The Kong Company, LLC ("KONG" or "Plaintiff") brings this action against Defendants Piccard Meds for Pets Corp, Marlon Martinez, and John Does 1-10 (collectively, "Defendants") for (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; (2) unfair competition in violation of the Lanham Act, 15 U.S.C. 1125(a)(1)(A); (3) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (4) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (5) common law trademark infringement and unfair competition; (6) deceptive trade practices in violation of C.R.S. § 6-1-105; (7) tortious interference with contract and business relations; and (8) breach of contract. These claims arise from Defendants' infringement of KONG's trademarks in connection with Defendants' unlawful and unauthorized advertisement and sale of KONG-brand products on the Internet.  In support of its Complaint, KONG alleges as follows:

## PARTIES

1.　　　KONG is a limited liability corporation, organized under the laws of the state of Colorado, with its principal place of business located in Golden, Colorado.

2.　　　Piccard Meds 4 Pets Corp ("Piccard Meds Corp") is a corporation organized under the laws of Florida.  According to corporate documents filed with Florida Department of State, the principal place of business of Piccard Meds Corp is located at 5521 Blanding Blvd., Jacksonville, FL 32244.  Piccard Meds Corp operates or assists in the operation of: (i) an online storefront on www.amazon.com ("Amazon") that is currently called "PICCARD MEDS 4 PETS CORP" and can be accessed at: https://www.amazon.com/sp?seller=AP4I3C6AVO63C (the "Amazon Storefront"); (ii) an online storefront on www.ebay.com ("eBay") that is currently called "piccardmeds4pets" and can be accessed at https://www.ebay.com/usr/piccardmeds4pets (the "eBay Storefront"); (iii) an online storefront on www.walmart.com ("Walmart") that is currently called "Piccard Meds 4 Pets Corp" and can be accessed at https://www.walmart.com/search/?facet=retailer:Piccard%20meds%204%20pets%20Corp&u1=&oid=223073.7502&wmlspartner=EHYQqRPS7QE&sourceid=12564175762614176502&affillinktype=4&veh=aff (the "Walmart Storefront"); and (iv) a private website located at https://piccardmeds4pets.com/ (the "Piccard's Pets Website").  Piccard Meds Corp does business throughout the United States through the Amazon Storefront, eBay Storefront, Walmart Storefront, and the Piccard's Pets Website.

3.　　　Marlon Martinez ("Martinez") is a natural person who, upon information and belief, resides at 1405 Edgewood Ave S, Jacksonville, FL 32205.  Martinez operates or assists in the operation of the Amazon Storefront, eBay Storefront, Walmart Storefront, and the Piccard's Pets

2

Website. Martinez does business throughout the United States through the Amazon Storefront, eBay Storefront, Walmart Storefront, and the Piccard's Pets Website.

4. Corporate documents filed with the Florida Department of State list Martinez as the "CEO" of Piccard Meds Corp. Martinez's email signature also identifies Martinez as the "CEO" of Piccard Meds Corp. Accordingly, upon information and belief, Martinez is in control of, a principal of, and primarily responsible for Piccard Meds Corp and its actions.

5. KONG asserts claims against Martinez in both his individual capacity as well as his capacity as a corporate officer of Piccard Meds Corp.

6. Until it conducts discovery, KONG cannot conclusively determine whether Martinez in his individual capacity, Piccard Meds Corp, or both operate the Amazon Storefront, eBay Storefront, Walmart Storefront, and Piccard's Pets Website. Upon information and belief, both Martinez in his individual capacity and Piccard Meds Corp assist in the operation of and sales of infringing products through these storefronts and websites.

7. Alternatively, upon information and belief, Martinez directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing KONG's trademarks by Piccard Meds Corp. Accordingly, Martinez is personally liable for infringing activities of Piccard Meds Corp without regard to piercing the corporate veil.

8. Alternatively, on information and belief, Piccard Meds Corp follows so few corporate formalities and is so dominated by Martinez that it is merely an alter ego of Martinez. Accordingly, KONG is entitled to pierce the corporate veil of Piccard Meds Corp and hold Martinez personally liable for the infringing activities of Piccard Meds Corp.

9. KONG believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute. The

true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to KONG. Therefore, KONG sues these Defendants by the fictitious names John Does 1 through 10. When the true names, involvement, and capacities of these parties are ascertained, KONG will seek leave to amend this Complaint accordingly. If KONG does not identify any such parties, it will dismiss these Defendants from this action.

## JURISDICTION

10.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367. KONG's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125, and its claims arising under the laws of Colorado are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Colorado and established sufficient minimum contacts with Colorado by, among other things, advertising and selling infringing products bearing KONG's trademarks to consumers within Colorado through multiple highly interactive commercial websites, through the regular course of business, with knowledge that KONG is located in Colorado and is harmed in Colorado as a result of Defendants' sales of infringing products to Colorado residents. Defendants know that KONG is located in Colorado, among other reasons, because they received cease-and-desist letters that identified KONG as a limited liability company located in Colorado and notified Defendants that their unlawful actions are harming KONG in Colorado. KONG's claims arise out of Defendants' sales of infringing products bearing KONG's trademarks to Colorado residents through the regular course of business.

## VENUE

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

### KONG and Its Trademarks

13.     KONG manufactures and distributes high-quality pet products including durable rubber toys, grooming supplies, and treats for dogs and cats.  KONG sells its products in the United States exclusively through a network of authorized distributors, retailers, and resellers ("Authorized Sellers").

14.     KONG permits Authorized Sellers to sell KONG products in approved channels only and requires Authorized Sellers to abide by applicable KONG policies relating to quality controls, customer service, and other sales practices (collectively, the "KONG Rules").

15.     Authorized Sellers include KONG's authorized distributors, who have permission under the KONG Rules to sell KONG products to pet-specialty enterprises that (a) sell primarily cat and dog products, (b) derive at least 85% of their sales from pet-related products, (c) adhere to the KONG Rules, and (d) have not had their Authorized-Seller status revoked by KONG.

16.     Authorized Sellers also include KONG's authorized resellers, who have permission under the KONG Rules to sell KONG products purchased from authorized distributors on to end users.  The KONG Rules define end users as any purchasers of KONG products who are the ultimate consumer of the products and who do not intend to resell the products.  Under the KONG Rules, an authorized reseller with physical retail locations is permitted to sell on websites that the reseller maintains, provided that the website publishes the reseller's full legal name and contact information and does not imply any third-party affiliations.  By contrast, authorized resellers

5

without physical retail locations cannot sell KONG products on the Internet unless they first obtain KONG's written consent.

17.     Finally, Authorized Sellers include authorized retailers, who consist primarily of large national retail chains that operate physical retail locations and purchase KONG products directly from KONG. Like authorized resellers, authorized retailers may, under the KONG Rules, sell on websites that retailers maintain provided that the websites publish retailers' full legal names and contact information and do not imply any third-party affiliations.

18.     KONG devotes a significant amount of time, energy, and resources toward protecting the value of its brand, products, name, and reputation. By distributing products exclusively through Authorized Sellers who are required to follow the quality controls and other requirements in the KONG Rules, KONG is able to ensure the safety, well-being, and satisfaction of consumers and their pets and maintain the integrity and reputation of the KONG brand. In the highly competitive pet-supplies market, quality and customer support are a fundamental part of a customer's decision to purchase a product.

19.     To promote and protect the KONG brand, KONG has registered numerous trademarks with the United States Patent and Trademark Office (the "KONG Trademarks"), including, but not limited to: KONG® (U.S. Trademark Reg. Nos. 1,443,417; 3,835,053; 4,760,777; 3,020,593; and 1,834,655); KONG SPORT® (U.S. Trademark Reg. No. 5,353,459); KONG NATURALS® (U.S. Trademark Reg. No. 4,334,916); KONG BALLISTIC® (U.S. Trademark Reg. No. 4,023,463); KONG SQUEEZZ® (U.S. Trademark Reg. No. 4,119,568); KONG FLYER® (U.S. Trademark Reg. No. 4,334,917); ZOOM GROOM® (U.S. Trademark Reg. No. 1,693,092); WOBBLER® (U.S. Trademark Reg. No. 4,497,715); KONG WOBBLER® (U.S. Trademark Reg. No. 3,971,491); KICKEROO® (U.S. Trademark Reg. No. 3,840,912); JUMP'N

6

JACK® (U.S. Trademark Reg. No. 3,225,590); TUGGER KNOTS® (U.S. Trademark Reg. No. 4,106,261); STUFF-A-BALL® (U.S. Trademark Reg. No. 2,826,095); BISCUIT BALL® (U.S. Trademark Reg. No. 2,276,435); EASY TREAT® (U.S. Trademark Reg. No. 3,857,585); EASY FREEZE® (U.S. Trademark Reg. No. 4,289,960); EZ SOFT® (U.S. Trademark Reg. No. 4,088,705); SNUGGEASE® (U.S. Trademark Reg. No. 3,487,294); CUTESEAS® (U.S. Trademark Registration No. 5,078,429); GOODIE BONE® (U.S. Trademark Reg. No. 2,850,495); BOUNZER® (U.S. Trademark Reg. No. 4,328,468); ZIGGIES® (U.S. Trademark Reg. No. 3,458,637); TAILS® (U.S. Trademark Reg. No. 4,328,398); KITTY KONG® (U.S. Trademark Reg. No. 4,457,480); WORLD'S BEST® (U.S. Trademark Reg. No. 4,565,747); CATS NEED TO PLAY (U.S. Trademark Reg. No. 4,475,714); DOGS NEED TO PLAY® (U.S. Trademark Reg. No. 4,283,312); YOUR DOG WILL LOVE YOU FOR IT® (U.S. Trademark Reg. No. 3,725,922); 2D ZOOM GROOM CAT BRUSH® (U.S. Trademark Reg. No. 4,904,352); 2D ZOOM GROOM DOG BRUSH® (U.S. Trademark Reg. No. 4,898,024); BRAIDZ® (U.S. Trademark Reg. No. 4,707,407); CLOUD® (U.S. Trademark Reg. No. 4,328,397); MARATHON® (U.S. Trademark Reg. No. 4,732,759); RECIPE FOR THE "PERFECT" DOG® (U.S. Trademark Reg. No. 4,503,539); and TENNIS PALS® (U.S. Trademark Reg. No. 4,732,966).

20.     The registration for each of the KONG Trademarks is valid, subsisting, and in full force and effect.  KONG's right to use many of the KONG Trademarks has become incontestable under 15 U.S.C. § 1065 because the trademarks have been in continuous use, KONG received no final legal decision issued against the trademarks, and KONG timely filed a Section 15 Declaration describing the trademarks' use.  Accordingly, these trademarks serve as conclusive evidence of KONG's ownership of the marks and of its exclusive right to use and direct the use of the marks

in commerce and in connection with the sale and distribution of products bearing the marks identified in the registrations, as provided by 15 U.S.C. § 1115(b).

21.     KONG actively uses and markets all of the KONG Trademarks in commerce throughout the United States.

22.     Consumers recognize the KONG Trademarks as being associated with high-quality products in the pet-supplies industry.

23.     Consumers associate the KONG name with the quality and innovation of KONG's products, which have been remarkably consistent and dependable since the company's founding in 1976.  For the past forty years and counting, KONG has been committed to taking all possible measures to guarantee safe, quality, innovative, and lasting products.

24.     KONG has received numerous awards and industry recognitions demonstrating consumers' association of the brand with quality.  These recognitions include, but are not limited to, the World Branding Forum's Global Brand Award for 2017 and 2019; Gomin's 2016 Most Promising Brand Award; Prevention Magazine's 2011 award for "The Best Chew Toys to Choose;" and Pet Product News's 2006 Best of the Best Award.

25.     Because of the quality of its products and decades-long use of the KONG name, consumers trust the KONG name and KONG products.

26.     For these reasons, the KONG Trademarks are widely recognized by the general consuming public of the United States and KONG is recognized as the source of products bearing the KONG Trademarks.

27.     Due to the superior quality and exclusive distribution of KONG products, as well as KONG's recognition as the source of high-quality products, the KONG Trademarks have substantial value.

**Online Marketplaces and the Challenges They Present to KONG Product Quality**

28.     E-commerce retail sales have exploded over the past decade.  From 2009 to the end of 2020, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 13.6%. *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS (May 18, 2021), https://fred.stlouisfed.org/series/ECOMPCTSA.

29.     In 2020, consumers spent $861 billion on e-commerce sales, a 44% increase from 2019.  The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2020, United States consumers spent more than $296 billion in e-commerce sales on Amazon, a 38.6% increase from 2019.  *See* Fareeha Ali, *U.S. ecommerce grows 44.0% in 2020*, Digital Commerce 360 (January 29, 2021), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

30.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

31.     Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

32.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online

9

marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

33.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016,  https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.   *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

34.     Third-party sellers on Amazon may also sell counterfeit items, or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

35.     For example, the Department of Homeland Security recently published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."  Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at

10

https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.  The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller."  *Id*. at 14-15, 38.  To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers."  *Id.* at 35.

36.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

37.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate

Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

38.     In its 2018, 2019, and 2020 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See* Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 30, 2020), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872420000004/amzn-20191231x10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 31, 2020), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/4d39f579-19d8-4119-b087-ee618abf82d6.pdf.  Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

39.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability to exercise control over the quality of its products presents serious risks to the safety of consumers and—in the case of KONG products—to consumers' pets.

40.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

41.     When purchasing products on an online marketplace, customers are not informed whether a seller of a product is authorized by the manufacturer.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand: [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

42.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

43.     When a customer purchases a product on a marketplace and receives a damaged, defective, expired, soon-to-expire, or other poor-quality product, the customer is much more likely to associate the problem product with the brand/manufacturer rather than the product seller.

44.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews.  Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

45.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such

reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

46.    Consumers place extraordinary trust in these online reviews.  Indeed, consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  *Moms Place Trust in Other Consumers*, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.

47.    Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces. Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019,  https://www.foxbusiness .com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

48.    Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product.  Graham Charlton, *How many bad reviews does it take to deter shoppers?*, ECONSULTANCY, April 11, 2011,  https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

49.    Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.

14

22938377.1

**Sales of Poor Quality KONG Products on Online Marketplaces Have Caused Consumers to Write Numerous Negative Reviews of KONG and KONG Products**

50.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, as well as its placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

51.     KONG has been the subject of numerous negative online marketplace reviews from customers who purchased KONG products of poor quality.  These customers complain of receiving defective, damaged, counterfeit, or otherwise low-quality products and give KONG products a poor rating, reducing the products' average rating and reputation.

52.     For example, on May 11, 2018, Amazon user "Andrea," complained that a KONG dog toy she purchased on Amazon was "old [or] wasn't stored correctly," and had exceedingly poor durability that caused it to last "all of about three hours" with her dog.

<div style="border:1px solid">

⭐☆☆☆☆ **This lasted all of about three hours with my King ...**
By Andrea on May 11, 2018
Size: Small  |  Package Type: Standard Packaging  |  Verified Purchase

This lasted all of about three hours with my King Charles Spaniel before he chewed a piece of it off. He has other Kong rubber toys which are still going strong. Clearly this one was old, wasn't stored correctly, they are being manufactured differently or something to be so brittle.

</div>

53.     On May 3, 2018, Amazon user "Yvonne Ebmeyer," complained that a KONG dog toy she purchased on Amazon was "SUPER DIRTY" when she received it.



⭐☆☆☆☆ **Super dirty when delivered**
By Yvonne Ebmeyer on May 3, 2018
Size: Medium  |  Package Type: Standard Packaging  |  Verified Purchase

I just got it in the mail two minutes ago and I got it out of the package and it's SUPER DIRTY!!!

15

54.     On March 16, 2018, Amazon user "S. Noble" complained that a KONG dog toy she purchased on Amazon had very poor durability while a KONG toy she had purchased in a store "was still going strong over a year later."  She questioned whether she had purchased a "knock off" product.



55.     On October 7, 2017, Amazon user "Zippy" complained that a KONG dog toy he purchased on Amazon had a toxic, "petroleum / gasoline" odor that he had not experienced with other KONG toys he had purchased.



56.     On January 22, 2017, Amazon user "Suzanne K" complained that a KONG dog toy she purchased on Amazon had a very strong and offensive odor that she had not experienced with other KONG toys she had purchased in the past.  She asserted that she was "extremely disappointed" and was "very hesitant to purchase again."



57.     On April 13, 2018, Amazon user "Jeremy Forbis" reported that KONG products are "[d]angerous for your dog" because he had to take his dog into surgery to remove a KONG toy he had purchased on Amazon from his dog's intestines and stomach.  He also wrote that "like

16

others who rated it poorly, I'm wondering if it was from a defective run or if it is a counterfeit version of the legitimate product."



> ★☆☆☆☆ **Dangerous for your dog.**
> By Jeremy Forbis on April 13, 2018
> Size: Large | Package Type: Standard Packaging | Verified Purchase
>
> This product is terrible!
> My 40 lb Spaniel destroyed it in no time and in fact went into surgery last night to remove par of it from his intestines and stomach. This product cost me big time.
>
> I had heard that this product was indestructible and that is by no means the case. I purchased the one appropriate for his size Large.
>
> Like others who rated it poorly, I'm wondering if it was from a defective run or if it is a counterfeit version of the legitimate product.

58.     On April 11, 2016, an Amazon Customer reported that he believed he had purchased a "knockoff" KONG dog toy on Amazon because his dog chewed through the toy in only a week while products he purchased at a store had lasted almost six months.

> ★☆☆☆☆ **Not as good as store bought**
> By Amazon Customer on April 11, 2016
> Size: XX-Large | Package Type: Standard Packaging | Verified Purchase
>
> This is most likely a knockoff too..the one I bought before from a store lastey way longer..my dog likes to chew on the nob of the smaller end on the toy..it took her almost 6mos to chew through the store bought and took a week to go through the Amazon bought..I'm just saying it's weird and makes you wonder...most like the last time I will buy any dog toys on Amazon

59.     On March 14, 2017, an Amazon Customer complained that a KONG dog toy he purchased on Amazon "looked weird, like a knock-off" and lasted only a few hours while a KONG toy he had previously purchased at a store lasted almost a year.

> ★☆☆☆☆ **like a knock off- the rubber was matte**
> By Amazon Customer on March 14, 2017
> Size: Large | Package Type: Standard Packaging
>
> My dog has another extreme KONG that has lasted almost a year but these..... lasted ONE day. First off, they looked weird, like a knock off- the rubber was matte. Then you've got the fact that my dog literally chewed these in half after only a few hours of play time... These aren't cheap-what a waste of money. I'll spend the few extra minutes and $$ to buy these directly from the store going forward.

60.     On April 25, 2018, Amazon user "Kayleigh" complained that a KONG dog treat she purchased on Amazon arrived in a broken container.

> ★☆☆☆☆ **Contents are still in can but the valve on top is broken so a complete waste of money**
> By Kayleigh on April 25, 2018
> Flavor Name: Peanut Butter | Verified Purchase
>
> One container has already broken. Contents are still in can but the valve on top is broken so a complete waste of money. Should have gone to Petco so I can at least return it easily.

17

61. On April 18, 2018, Amazon user "Rileigh's GMa" complained that a KONG dog treat she purchased on Amazon caused her dog to get sick, dry heave, and stop eating. Because of differences between the product and another product she purchased at a brick-and-mortar store, she reported that the Amazon product "had to be a fake."

> ⭐☆☆☆☆ **We stopped giving it to her and 3 days later she was fine. I put the King toy in water to ...**
> By Rileigh's GMa on April 18, 2018
> Flavor Name: Peanut Butter | Verified Purchase
>
> I would leave no stars, but I can't. This particular can had to be a fake. My dog usually loves this stuff. She got sick, dry heaving, wouldn't eat....then refused this in her Kong which was very weird as she usually gets so excited for it. Figured out that this can was the only new thing she'd had that was different than normal . We stopped giving it to her and 3 days later she was fine. I put the Kong toy in water to soak the product out, and it was like rubber. I put product from a can from Petco in water, and it was soft and dissolved. Scary that this was probably a fake! I will spend more and buy from Petco or PetSmart. No more Amazon pet products for me!

62. On November 14, 2017, Amazon user "marissa menzano" complained that a KONG dog treat she purchased on Amazon arrived in the wrong flavor.

> ⭐☆☆☆☆ **One Star**
> By marissa menzano on November 14, 2017
> Size: 8 oz | Verified Purchase
>
> I ordered pepperoni, received liver. Not worth the hassle of returning.

63. On January 8, 2016, Amazon user "Fat Guy in a Little Coat" complained that a KONG dog treat he purchased on Amazon had a liquid consistency rather than the paste consistency he had experienced with all of his prior purchases.

> ⭐☆☆☆☆ **Defective product with no refund**
> By Fat Guy in a Little Coat on January 8, 2016
> Flavor Name: Bacon/Cheese | Verified Purchase
>
> I am updating my review of this product. On my last shipment the dispenser was defective and the contents were liquid. When depressed, liquid cheese rapidly sprays out of the can. It is a total mess. I have used this product many times before. It should slowly dispense as a paste (not a liquid). The seller does not provide refunds. Hench a 1 star rating is earned.

64. On April 2, 2018, Amazon user "debugnlily" complained a KONG toy he purchased on Amazon was destroyed by his dog "in a day or so." He reported that this lack of durability was far different from previous KONG products he had purchased and questioned whether he had received a "knock off."

⭐☆☆☆☆ **Disappointed with quality**
By debugnlily on April 2, 2018
Size: Medium | Color: Spunky the Monkey | Verified Purchase
Not a good product anymore. Not the kong products of the past that last and last. Puppy that is 25 lbs destroyed the monkey in a day or so. Not sure if this is a knock off or not. Very dissatisfied.

65.    On December 26, 2016, Amazon user "Michael Pennington" complained that a KONG dog toy he purchased on Amazon was "already broken" when he received it and was then "torn apart almost immediately" by his dog. He stated that "I expected better quality from this brand, especially when it advertises the toy as being extra tough."



66.    On July 2, 2015, Amazon user "van Gogh" complained that a KONG dog toy he purchased on Amazon "seemed defective from the start," and was destroyed by his dog after only 20 minutes of play. He noted that previous KONG products he had purchased had lasted much longer and asked "[a]re there fake Kong toys on Amazon?"

⭐☆☆☆☆ **who loved their previous kong cozies and played with them for ...**
By van Gogh on July 2, 2015     Size: Medium | Color: Buster the Koala | Verified Purchase
Gave this to my 12 lb maltipoos, who loved their previous kong cozies and played with them for weeks before fully ripping them apart.

This one seemed defective from the start, within 20 minutes my dog had ripped one of its legs off. It did not last a full day before all the stuffing was all over my floor. Are there fake Kong toys on Amazon? If so I feel like I may have gotten one.

67.    On January 18, 2018, Amazon user "Amanda Gargus" complained that a KONG product she purchased on Amazon arrived in damaged condition.



68.     On March 4, 2016, Amazon user "Amanda Bert" complained that a KONG product she purchased on Amazon was "damaged," "ripped," and "dirty" when it arrived.



69.     The foregoing reviews are only a small sample of the negative reviews of KONG products that have been posted on the Amazon platform.

**KONG Has Implemented Quality-Control Procedures to Combat the Problems Presented by Online Marketplaces, Protect the Value of the KONG Trademarks, and Ensure Customers Receive the Genuine, High-Quality Products They Expect from KONG**

70.     The above reviews show how sales of poor-quality KONG products disappoint KONG's consumers, endanger the health and safety of consumers' pets, and cause significant harm to KONG's reputation and goodwill.  To protect itself and consumers from these harms, KONG implemented a quality-control program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

71.     The goal of KONG's program is to ensure that consumers who purchase KONG products receive products that feature all of the special characteristics consumers have come to expect from products sold under the KONG name, especially safety and quality.

72.     The program seeks to minimize the likelihood that poor-quality products will reach consumers.  By preventing consumers from receiving poor-quality products, the program protects

20

consumers from confusion and unsafe products as well as the value and goodwill associated with the KONG brand.

73. KONG abides by its quality-control procedures. Moreover, as discussed below, KONG requires its Authorized Sellers to abide by the quality-control requirements and audits its Authorized Sellers to ensure that they comply.

74. KONG's ability to exercise its quality controls has a direct impact on the health and safety of consumers and their pets, who face risks by coming into contact with or ingesting malfunctioning, expired, or improperly stored or handled products.

75. KONG's ability to exercise its quality controls is essential to maintaining the integrity, safety, and quality of KONG products, as well as the value of the KONG Trademarks and other intellectual property.

**Authorized Sellers Must Adhere to KONG's
Quality-Control and Customer-Service Requirements**

76. KONG maintains strict quality controls over KONG products by selling them exclusively to Authorized Sellers.

77. To prevent unauthorized third parties from acquiring and reselling KONG products, the KONG Rules permit Authorized Sellers to sell products to authorized customers only, including pet-specialty shops and other authorized resellers, as well as end users who are the ultimate consumers of the products and do not intend to resell them.

78. The KONG Rules require Authorized Sellers to adhere to KONG's quality controls.

79. To ensure that customers receive the genuine, high-quality products they expect from KONG, the KONG Rules require that Authorized Sellers inspect all products for damages, defects, odors, and other non-conformance and not sell any defective KONG products. Authorized

Sellers must also inspect their inventory at regular intervals for expired or soon-to-be expired products and remove them from inventory.

80.     In addition, the KONG Rules require Authorized Sellers to exercise due care in storing and handling KONG products, including storing them in a cool, dry place, away from direct sunlight, extreme heat, and dampness.  Poor storage of KONG products can result in reduced durability and other problems that customers have frequently complained about in their online marketplace reviews of KONG products.  *See, e.g., supra* ¶¶ 52-56, 58-60, 63-68.   Upon information and belief, many negative customer complaints about durability of KONG products are attributable to poor storage practices.

81.     To avoid consumer confusion and ensure that customers receive genuine KONG products, the KONG Rules prohibit Authorized Sellers from relabeling, repackaging, or altering KONG products without written consent from KONG.  Authorized Sellers must not remove, translate, or modify the contents of any label or literature accompanying KONG products.  Further, Authorized Sellers are prohibited from tampering with, defacing, or otherwise altering any identifying information on KONG products, including lot and batch codes and UPCs.

82.     KONG also ensures that consumers receive safe products by requiring that Authorized Sellers assist with recalls and other consumer-safety information efforts.

83.     The KONG Rules also require Authorized Sellers to provide certain services to their customers.  Authorized Sellers must familiarize themselves with the features of all KONG products kept in their inventory so that they can advise customers on the selection and safe use of KONG products and share any applicable warranty, guarantee, or return-policy information.

84.     Following the sale of genuine KONG products, Authorized Sellers must provide ongoing support to consumers and prompt replies to their inquiries.

85.     Authorized Sellers agree to permit KONG to audit and monitor their activities to ensure their compliance with KONG's quality-control and customer-service requirements, including by permitting inspection of their facilities and records relating to KONG products.

86.     KONG's quality-control requirements are legitimate and substantial and have been implemented to facilitate KONG's control over the quality of goods manufactured and sold under the KONG Trademarks.  These controls enable KONG to protect consumers and the value and goodwill associated with the KONG Trademarks.

87.     KONG's quality-control requirements are material because they are designed to protect consumers and prevent them from receiving poor-quality products that could harm them or their pets.

88.     Consumers find it material and relevant to their purchasing decisions to know whether a KONG product is being sold by an Authorized Seller that is subject to KONG's quality-control requirements, or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, KONG's quality controls and over whom KONG cannot exercise quality control.

### Given the Flood of Poor-Quality Products on Online Marketplaces and Consumers' Inability to Inspect Products Before Purchasing Them Online, KONG Imposes Additional Requirements on Its Authorized Sellers Who Sell Online

89.     As shown in consumer reviews cited above, *see supra*, ¶¶ 51-69, KONG products sold online are more susceptible to quality and authenticity problems as consumers cannot see products at the time of purchase.  These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.

23

90.     Given these heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sales, KONG imposes additional quality-control requirements on all of its Authorized Sellers who sell KONG products online.

91.     The KONG Rules allow Authorized Sellers to sell KONG products on the Internet only through "Permissible Websites" and "Authorized Websites."  These rules allow KONG to oversee all Authorized Sellers who sell KONG products online.

92.     Authorized Sellers who maintain physical retail locations providing face-to-face customer interaction are permitted to sell KONG products to end user through Permissible Websites.  The KONG Rules define a "Permissible Website" as a website that: (1) is operated by an Authorized Seller in the Authorized Seller's name; (2) lists the Authorized Seller's full legal name, mailing address, telephone number, and email address; and (3) does not give the appearance that is operated by KONG or any third party.  Permissible Websites do not include storefronts on online marketplace websites like Amazon.

93.     An "Authorized Website" is a website that KONG has specifically approved an Authorized Seller to use to sell KONG products. Authorized Sellers cannot sell on Authorized Websites unless and until they receive KONG's written approval.  Authorized Sellers who do not meet the requirements for being able to sell on a Permissible Website (*i.e.*, those that do not maintain a physical retail location providing face-to-face consumer interaction) may sell KONG products online only through an Authorized Website.

94.     To submit a proposed Authorized Website for consideration by KONG, an Authorized Seller must submit an application that provides various items of information about its business and the website(s) where it wishes to sell KONG products.  KONG vets its Authorized Sellers that submit applications as well as the websites proposed by these sellers to ensure that

24

they meet KONG's criteria and will represent the KONG brand properly.  This vetting includes review of applicants' length of time in business, general knowledge of the pet industry, Google advertising, social media presence, and other types of products and brands sold by an applicant.

95.     For KONG to exercise its quality controls over products sold online, it must know what websites its Authorized Sellers are selling on and under what names.  Accordingly, the KONG Rules prohibit Authorized Sellers from selling anonymously online and instead require them to state their business name and current contact information on all websites where they sell. This requirement allows KONG and consumers of KONG products to address any quality issues or negative reviews that arise.  This requirement also allows KONG to protect the public from the sale of poor quality and counterfeit KONG products because it allows for easy detection of any Authorized Seller that sells poor quality or counterfeit goods.  Numerous customers purchasing KONG products on Amazon have complained of purchasing products the customers believed to be counterfeit.  *See, e.g., supra* ¶¶ 54, 57-59, 61, 64, 66.

96.     Authorized Sellers that sell KONG products on Permissible Websites or Authorized Websites ("Authorized Online Sellers") must also adhere to additional requirements under the KONG Rules.

97.     For example, Authorized Online Sellers must use images of KONG products provided or approved by KONG and keep product descriptions up to date.

98.     Authorized Online Sellers are prohibited from representing or advertising any KONG product as "new" that has been returned, repackaged, or otherwise been altered by a customer.  When customers return products that were purchased online, many websites and online marketplaces will, by default, repackage the products and allow them to be relisted as "new."  The KONG Rules prohibit Authorized Online Sellers from allowing or carrying out this practice, to

ensure that customers receive the high-quality KONG products that customers expect when they purchase "new" products.

99.     Unless otherwise approved by KONG, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for KONG products.  Authorized Online Sellers are also prohibited from using any fulfillment or storage service that could cause or allow customers to receive KONG products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet KONG's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of KONG's quality controls.

100.     All websites through which Authorized Online Sellers sell KONG products must comply with all applicable data security, accessibility, and privacy requirements.

101.     In addition, Authorized Sellers who are approved to sell on Authorized Websites may sell KONG products only on the websites and under the name(s) specifically approved by KONG.  At KONG's request, Authorized Sellers must provide access to and copies of all web pages that make up Authorized Websites where Authorized Sellers are selling KONG products.

102.     Authorized Websites must have a mechanism for receiving customer feedback, and Authorized Sellers who sell on Authorized Websites must take appropriate steps to address any feedback received.  Authorized Sellers must also: (i) keep copies of all information related to customer feedback regarding KONG products and Authorized Sellers' responses; (ii) provide this information to KONG upon request; and (iii) cooperate with KONG in investigating negative online reviews related to sales of KONG products.

22938377.1

103.    The additional quality-control requirements that KONG imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow KONG to carefully control the quality of KONG products that are sold on the Internet and address any quality issues that arise.

104.    KONG's additional quality controls for online sales are also material, as they have been implemented to ensure that consumers who purchase KONG products on the Internet receive genuine, high-quality KONG products that abide by KONG's quality controls.   Consumers purchasing KONG products on the Internet would find it relevant to their purchasing decision to know whether the product they are buying is vended by an Authorized Online Seller who is subject to, and abides by, KONG's quality controls.

### KONG Monitors and Audits Its Authorized Sellers to Ensure They Comply with KONG's Quality-Control Requirements

105.    To ensure that KONG's Authorized Sellers who sell in brick-and-mortar stores are adhering to KONG's quality control requirements, KONG regularly conducts and oversees in-store visits of Authorizer Sellers' retail establishments to evaluate their compliance with KONG's quality-control requirements.   These in-store visits occur multiple times each month and carried out by KONG employees as well as contracted sales agencies.   During these visits, examiners check to see if: (i) KONG products or their packaging are damaged or defective; (ii) KONG products are properly displayed and represented to consumers; and (iii) store associates are familiar with KONG products and the benefits of the products.

106.    KONG also regularly monitors and audits its Authorized Online Sellers, to ensure that these sellers and their websites are complying with KONG's quality-control requirements.

27

KONG carries out these auditing and monitoring actions pursuant to an internal program called the KONG Online Quality Control Auditing Program ("Auditing Program").

107.   As part of its Auditing Program, KONG examines every Approved Website and a rotating sample of Permissible Websites each month to ensure that the Authorized Online Sellers who sell through these websites are complying with the KONG Rules.  During these examinations, KONG checks to make sure that, among other requirements, the websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by KONG or a third party; (iii) do not display any content that could be detrimental to the KONG brand; (iv) do not make any representations regarding KONG products that are misleading; (v) exclusively contain images of KONG products and product descriptions that are supplied or authorized by KONG and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

108.   Each month, KONG also inspects online reviews of KONG products and Authorized Online Sellers that appear on Authorized Websites.  If KONG discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor-quality KONG products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, KONG communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

109.   Each month, KONG also conducts a test purchase of a KONG product from a rotating sample of Authorized Websites and Permissible Websites.  If KONG discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not

28

following the quality control requirements that Authorized Online Sellers must follow when selling on Authorized Websites or Permissible Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—KONG communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

110.    Through its Auditing Program, KONG may visit the facilities of its Authorized Online Sellers to confirm that all of its quality control requirements are being followed and that Authorized Online Sellers are not selling any counterfeit KONG products.

111.    If KONG discovers that an Authorized Online Seller is selling KONG products of poor quality or otherwise not adhering to KONG's quality control or customer service requirements, KONG conducts an investigation to determine the source of the problem.  The KONG Rules require that Authorized Online Sellers cooperate with KONG's investigation, permit KONG to inspect their facilities and records relating to KONG products, and disclose all information about where they obtained KONG products.  Based on what its investigation reveals, KONG has the right to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of KONG products.

**Genuine KONG Products Come with the KONG Satisfaction Guarantee;
Defendants' Products Do Not**

112.    KONG toy and treat products purchased from Authorized Sellers also come with a satisfaction guarantee offered by KONG ("Satisfaction Guarantee").  Under the Satisfaction Guarantee, a customer can receive a refund or a manufacturer's coupon for a product replacement if the customer is dissatisfied with a KONG toy or treat product for any reason and contacts KONG within 60 days of the date of purchase.

29

113.    KONG extends the Satisfaction Guarantee only to products that were sold by sellers that are subject to KONG's quality controls.  Because products sold by unauthorized sellers are not subject to KONG's quality controls and KONG cannot ensure the quality of such products, KONG does not extend the Satisfaction Guarantee to products sold by unauthorized sellers, including Defendants.   The full terms of the Satisfaction Guarantee can be viewed at https://www.kongcompany.com/guarantee.

114.    The Satisfaction Guarantee is a material component of genuine KONG products. Consumers who purchase KONG products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that KONG stands behind the product, and that they can receive a refund or product replacement from KONG if they are unsatisfied for any reason.

115.    Consumers would find it material and relevant to their purchasing decision to know whether the KONG product they are buying is covered by the Satisfaction Guarantee.   If a consumer knew that a KONG product did not come with the Satisfaction Guarantee, the consumer would be less likely to purchase the product.

**Following the Implementation of KONG's Quality-Control Program, Unauthorized Sellers Who Are Outside KONG's Quality Controls Have Continued to Sell Poor Quality Products and Caused Consumers to Write Negative Reviews of KONG and KONG Products**

116.    Following KONG's implementation of its quality-control program, customers who purchase on online marketplaces have continued to leave extremely negative reviews of KONG and KONG products.  Customers have continued to leave these reviews because many sellers on online marketplaces are unauthorized sellers of KONG products who are not subject to and do not follow the quality controls that KONG requires its Authorized Sellers to follow.  Customers who purchase from these unauthorized sellers complain of receiving defective, damaged, counterfeit,

30

or otherwise low-quality products and give KONG products a poor rating, reducing the products' average rating and hurting their placement in search results. These reviews harm KONG's reputation and goodwill and cause it to lose sales.

117. For example, on May 18, 2021, Amazon user "Erin R. Oyama" reported that a KONG dog toy she purchased on Amazon "has a horrible chemical smell." She asked: "Is this normal? Is it safe for my dog to chew and lick?"



118. On April 2, 2021, Amazon user "Brittany close" reported that there "there is no way" a KONG product she purchased on Amazon is "real kong because it was eat[en] through in 4 hours."



119. On March 6, 2021, Amazon user "Tiffany Bucher" complained that a KONG product she purchased on Amazon "arrived with old food on the inside," was "Super gross," and "was clearly used at least once before" it was sent to her.



22938377.1

120.    On January 31, 2021, Amazon user "A" reported that, "like others have mentioned," a KONG product she purchased on Amazon "came with a very strong smell that will not fade even after soaking with soap."  She noted that "It isn't something I have ever noticed from Kongs bought in the store.  I'm wondering if they make specific ones to sell on Amazon made out of different materials to keep the cost down?"



121.    On January 15, 2021, Amazon user "Happy Shopper" complained that "We have purchase[d] other Kong toys in the past" and "This particular one has something wrong with it. It is sticky.  We tried to wash it and it got worse.  It stuck to the towel and it stuck to our hands.  Turned us off to Kong products."



122.    On January 2, 2021, Amazon user "Rick" reported that products he had purchased on Amazon that purported to be KONG products "are not the original kong toys" and had been destroyed in "ten minutes.  He wrote: "this toy is not what the manufacturer advertised at all."



123.    On October 30, 2020, Amazon user "JRW" complained that KONG dog toys she purchased on Amazon "smelled horribly of chemicals," and that the odor remained even after she "soaked and scrubbed" the toys.  She explained: "I've bought kongs before and have not had this problem.  Very disappointed."



124.    On October 24, 2020, Amazon user "Becky Jo" also complained that a KONG dog toy she purchased on Amazon "has a horrible chemical smell which almost makes me sick."  She noted that her dog "was repelled by the smell" and "wants nothing to do with it."  She speculated that the product she received is a "knock-off."



125.    On August 9, 2020, Amazon user "kim c." complained that she had to return a KONG product she purchased on Amazon "due to the chemical smell."  She explained that she

33

had purchased the same product "at least 5-10 years ago, still has it, and "it never smelled like that."  She concluded: "[t]hey are sacrificing quality to make more money."



126.    On August 6, 2020, an Amazon customer complained that "like some of the other reviewers," her dog chewed through a KONG product she purchased on Amazon "in one day" even though she had previously purchased the same product and her dog "wasn't able to chew it through it for 6 months."  She noted that "[t]he rubber is flimsy and not KONG quality," and she questioned whether she had received "[n]ot an actual Kong?"



127.    On June 12, 2020, Amazon user "Elly" warned other customers that a KONG dog toy she purchased on Amazon almost killed her pitbull.  She explained that she is "[t]rying to figure out if it released a chemical or something because my pocket pit became really ill like blood squirting out of her rectum and yellow bile and we found the Kong with white crusty hard powder inside of it so I would never buy another one again!!!"



34

128.    On May 27, 2020, Amazon user "Lois E. de Coux complained that a KONG product she purchased on Amazon "came all broken so the pieces just [fell] out of the Kong Ball."



129.    On April 17. 2020, Amazon user "Laura" complained that a KONG product she purchased on Amazon "came with an intense chemical/rubber smell."  She described the product as a "waste of money!" because the product "still stinks" and her dog "refuses to use it" even after she washed and soaked the product.  She also questioned whether the product was a legitimate "Kong" product "because I've never had this issue with a store-bought Kong."



130.    On April 3, 2020, Amazon user "Utah801" complained that a KONG product she purchased on Amazon "was USED and did not come NEW."  She explained that "[b]efore we even opened the package we could see brown dirt marks all over it."



35

131.    On March 14, 2020, Amazon user "Monikalou" complained that, when she received a KONG product she had purchased on Amazon, the bottom of the product was "badly torn up and cracked in some spots."  She explained that she is "disappointed in the quality of the product and looking for an alternative now."



132.    On November 15, 2019, Amazon user "Paul" complained that a KONG dog toy he purchased on Amazon was not of the same durability as other toys he had purchased in retail stores: "I purchased this thinking it was the same as you get in the big pet stores.  It was not.  The one from the pet store was more rubber and lasted a long time.  This one is almost like a type of soft plastic that was easily chewed up in a few weeks."



133.    On November 10, 2019, Amazon user "Matt Vermeulen" complained that a KONG product he purchased on Amazon had a strong chemical odor that had not been present in previous KONG products he had purchased:  "I have bought a lot of Kong's in my life and have never had any issues.  This is the first time I have ever had one smell like chemicals not rubber.  The smell is so STRONG I could smell it before I even opened the Amazon envelope it came in.  It is

22938377.1

currently sitting in the sink in hot soapy water and I can smell it as soon as I walk into the kitchen. I should note, I am not someone with a keen sense of smell.  I will not be giving this to my dog."



134.    On November 1, 2019, Amazon user "Bill" wrote that "Kong is not as tough as it used to be" after he purchased a KONG product on Amazon that had much worse durability than previous products he had purchased.  He reported that "[t]hey are not making the Kong like they used to…I had a Kong that outlasted my Rottweiler (110lbs) and my Viszla (90lbs).  I ordered a new Kong for my 1 year old mutt (35 lbs) and she had it in pieces (which she ate and then threw up) within 2 days of it's arrival into our household.   Anyone else having this issue with the product?"  He added: "don't know if manufacturing changed but disappointed."



135.    On October 28, 2019, Amazon user "Patrick T McCutcheon" reported that a product he purchased on Amazon was "Fake KONG, not a real KONG product.  Flimsy and fell apart immediately."



37

22938377.1

136.    On October 25, 2019, Amazon user "Ricardo P. Moreira" complained that a KONG dog toy he purchased on Amazon was "[n]ot the same quality" as a KONG product he had previously purchased: "This thing was all to pieces in less than 4 days.  Not the same quality that used to be Or just a cheap copy.  I was concern that my dog swallow over half of it before I realized he was able to break it.  I had a original Kong that last for years this not the same quality.  Be aware can cause serious injury or death to your dog."



137.    On September 26, 2019, Amazon user "AmazonShopper91" reported she purchased a KONG product on Amazon containing rubber that "had a very strong odor that cannot be washed off.  I don't think this is even safe to be in the mouth of a dog.  I just threw it away."



138.    On September 9, 2019 an Amazon user complained that a product she purchased on Amazon was "probably not real Kong" and "lasted 5 days."

38



139.    On August 29, 2019, Amazon user "Clarice" complained that a KONG product she purchased on Amazon "[c]ame in the mail with dirt marks all over it.  Tried to wash it off but they're pretty intact, like they've dragged across gravel . . . .  The appearance is also pretty unacceptable.  The entire thing is covered in haphazardly cut rubber edges, and the kong I received just screams "DEEEFEEEEECT!"  The kongs I've seen sold in stores do NOT look like this, so idk what the hell happened or if these are fake . . . . poor quality for the price I paid.  Definitely not worth it."



140.    On August 21, 2019, Amazon user "S. Pyle" complained that a KONG product she purchased on Amazon "Has to be a knock off!" and urged customers to not "[waste] your money."  She explained that "I've owned many Kong toys over 10 years & this toy didn't last five minutes."

39

141.    The foregoing reviews are only a small sample of the negative reviews of KONG products that have been posted on the Amazon platform since KONG implemented its quality-control program.

142.    Amazon does not allow product reviews to identify the seller that sold the product that is the subject of the product review.  Given that Defendants are selling a high volume of products bearing the KONG Trademarks on Amazon and are not subject to KONG's quality controls, however, it is likely that some of the foregoing negative reviews—and the many similar reviews of KONG products that appear on the Amazon website—were written by customers who purchased products bearing the KONG Trademarks from Defendants.

**Defendants are Not Authorized Sellers and are**
**Illegally Selling Products Bearing the KONG Trademarks**

143.    In the course of monitoring online listings of KONG products, KONG discovered a high volume of products bearing the KONG Trademarks being sold illegally by Defendants through multiple websites and online storefronts, including the Amazon Storefront, eBay Storefront, Walmart Storefront, and the Piccard's Pets Website.

144.    Through investigation, KONG determined that Piccard Meds Corp are responsible, at least in part, for the operation of the Amazon Storefront, eBay Storefront, Walmart Storefront, and the Piccard's Pets Website.  KONG subsequently contacted Martinez, who confirmed that he and Piccard Meds Corp sell products bearing the KONG Trademarks.

145.    On or around March 4, 2019, KONG and Martinez entered into a sell-through agreement.  In the agreement, Martinez promised that, after March 31, 2019, neither he nor anyone else acting at his direction or on his behalf would sell KONG products through any online marketplace, including Amazon, eBay, and Walmart.  Martinez also agreed that he would

40

permanently cease acquiring any KONG products for the purpose of resale on any online marketplace. In exchange, KONG agreed that it would suspend its trademark enforcement efforts against Martinez and approve Martinez as an Authorized Seller, with permission to sell KONG products online through the Piccard's Pets Website.

146.    Martinez did not comply with the sell-through agreement. After March 31, 2019, Martinez and Piccard Meds Corp continued to sell products bearing the KONG Trademarks through their Amazon Storefront and Walmart Storefront.

147.    On July 1, 2019, KONG notified Martinez that he was breaching the sell-through agreement by continuing to sell products on online marketplaces. KONG also warned Martinez that, if he did not cease selling products on all online marketplaces, he would permanently lose his status as an Authorized Seller of KONG products.

148.    After further communications over the following months and Martinez's continued failure to cease selling products bearing the KONG Trademarks on online marketplaces, KONG notified Martinez on October 17, 2019 that his status as an Authorized Seller of KONG products had been permanently revoked. KONG also told Martinez that he must cease selling products on all online marketplaces by the end of October 18, 2019, or KONG would pursue him for breach of his sell-through agreement.

149.    Since October 17, 2019, Martinez has not been an Authorized Seller of KONG products and has operated outside of KONG's quality controls.

150.    Over the following 18 months, Martinez and Piccard Meds Corp periodically ceased selling products bearing the KONG Trademarks but then relisted the products on their Amazon Storefront, eBay Storefront, Walmart Storefront, and the Piccard's Pets Website.

41

151.    On February 8, 2021, after Martinez and Piccard Meds Corp again relisted products, counsel for KONG sent a cease-and-desist letter to Martinez and Piccard Meds Corp via mail and email.  KONG's letter explained that Defendants were infringing on the KONG Trademarks and tortuously interfering with KONG's contracts by purchasing products from Authorized Sellers, who are prohibited from selling products to non-Authorized Sellers who resell the products.  The letter also explained that Martinez had breached his sell-through agreement with KONG by continuing to sell products bearing the KONG Trademarks on online marketplaces after March 31, 2019, and by continuing to acquire products for the purpose of reselling them on online marketplaces.  KONG's letter demanded that Defendants permanently cease selling products bearing the KONG Trademarks and disclose every person and entity that provided Defendants with the products they had listed for sale.

152.    Defendants did not respond to KONG's February 8, 2021 letter, and continued to advertise and sell products bearing the KONG Trademarks through their Amazon Storefront, eBay Storefront, Walmart Storefront, and the Piccard's Pets Website.

153.    On March 10, 2021, KONG sent a second cease-and-desist letter to Martinez and Piccard Meds Corp via mail and email.  This letter notified Defendants that KONG was preparing to file a lawsuit and that Defendants have a legal obligation to preserve all documents and information related to their acquisition and sale of products bearing the KONG Trademarks.

154.    KONG and Martinez had a telephone conference regarding KONG's letters on March 23, 2021.  During the conference, Martinez acknowledged that he and Piccard Meds Corp were selling products bearing the KONG Trademarks and agreed to cease their sales.

155.    Although Defendants briefly ceased their sales of products bearing the KONG Trademarks following the March 23, 2021 telephone conference, Defendants resumed their sales

on or around April 10, 2021. Over the following month, Defendants returned to their pattern of temporarily delisting products bearing the KONG products from their websites and online storefronts only to resume listing them again a short time later, in apparent attempts to avoid KONG's detection.

156.    On May 5, 2021, KONG notified Martinez by email that it had observed Defendants repeatedly listing products bearing the KONG Trademarks on Amazon over the previous month. KONG explained that it was "extremely concerned that you do not appear to be honoring your commitment," and asked Defendants to notify KONG immediately if KONG was somehow mistaken in its observation that Defendants had continued to list and sell products on Amazon.

157.    KONG has not received any response to its May 5, 2021 email. Since May 5, Defendants have continued to periodically advertise and sell products bearing the KONG Trademarks through their Amazon Storefront, eBay Storefront, Walmart Storefront, and the Piccard's Pets Website.

158.    Defendants have sold a high volume of infringing products bearing the KONG Trademarks through their Amazon Storefront. Monitoring software estimates that, since February 2018, Defendants have sold more than 28,000 infringing products through their Amazon Storefront for revenue in excess of $400,000.

159.    Upon information and belief, through their Amazon Storefront, eBay Storefront, Walmart Storefront, and Piccard's Pets Website, Defendants accept and fulfill orders from Colorado residents for products bearing the KONG Trademarks and cause infringing products bearing the KONG Trademarks to be shipped to persons located in Colorado through the regular course of business. Defendants have taken no steps to prevent persons located in Colorado from

purchasing products bearing the KONG Trademarks from Defendants' Amazon Storefront, eBay Storefront, Walmart Storefront, or Piccard's Pets Website.

160.     KONG's February 8, 2021 letter provided notice to Defendants that KONG is located in Colorado and is harmed in Colorado by Defendants' illegal sales of infringing products bearing the KONG Trademarks.  Defendants also learned of KONG's presence in Colorado during their negotiations with KONG in 2019 and entry into the sell-through agreement on or around March 4, 2019.

161.     As of the time of filing, Defendants' Amazon Storefront is called "PICCARD MEDS 4 PETS CORP."  Defendants can change the name of their Amazon storefront at will, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  The Merchant ID number for Defendants' Amazon Storefront is AP4I3C6AVO63C.  Even if Defendants change the name of their Amazon Storefront at some time in the future, the following link—that includes the Merchant ID number for Defendants' storefront—will always direct to Defendants' storefront:

     a.   https://www.amazon.com/sp?seller=AP4I3C6AVO63C

162.     Defendants' disregard of KONG's cease-and-desist letters and their continued sales of non-genuine products despite their repeated promises agreements to stop selling show that they are acting intentionally, willfully, and maliciously.

**Defendants Are Selling Damaged, Defective, and
Other Poor Quality Products and Providing Poor Customer Service**

163.     Customer reviews of Defendants' eBay Storefront, Walmart Storefront, and Amazon Storefront show that Defendants have sold products that were damaged, defective, counterfeit, tampered with, previously used, improperly packaged, different from what customers

had ordered, or of otherwise poor quality.  Customer reviews also show that Defendants are providing extremely poor customer service, including misrepresenting products and details of customers' orders.

164.    For example, an eBay user who purchased a KONG product from Defendants' eBay Storefront complained that the product was defective and destroyed by her dog "in five minutes ot less."  The customer lamented that "[i]t was a total waste of money."



165.    A different eBay user who purchased a KONG product from Defendants' eBay Storefront reported that she was "VERY DISAPPOINTED" with her purchase.



166.    On May 13, 2020, Walmart user "Kathleen" complained that a product she purchased from Defendants' Walmart Storefront arrived in "[p]oor packaging" and "came crushing and leaking all over."

> ★★★★★
>
> Poor packaging - item came crushed and leaking all over
>
> Kathleen, May 13, 2020

167.    On April 17, 2021, Amazon user "yvette green" questioned whether a product she purchased from Defendants' Amazon Storefront was "fake" because the product "doesn't seem to be working."

> ★★★★★   "I am wondering if I have received another " fake" product? I have received one in the past. I'm asking because this time it doesn't seem to be working."
>
> By yvette green on April 17, 2021.

45

168.   On April 29, 2021, an Amazon Customer who purchased from Defendants' Amazon Storefront reported that she was "really mad" because there was a "big tear" in the package she received and her product had been previously opened and taped over, causing it to leak inside her package.

> ★☆☆☆☆   "im really mad. there is a big tear in the upper portion of the package and BABY FORMULA is seeping out of it. also, and this really bugs me, there is clear packing tape all along the bottom seams of the bag- obviously done to hide the fact that this bag of BABY FORMULA has been opened! the freshness date was good, so Piccard didn't take any care with the merchandise in their custody."
> Read less
> By Amazon Customer on April 29, 2021.

169.   On April 28, 2021, Amazon user "barb boot" complained that a product she purchased from Defendants' Amazon Storefront arrived with missing components.

> ★☆☆☆☆   "only the bottom of the feeder arrived, not the top with the holes"
> By barb boot on April 28, 2021.

170.   On March 9, 2021, Amazon user "Becky Manning" complained that a product she purchased from Defendants' Amazon Storefront arrived empty.

> ★☆☆☆☆   "There were NO test strips in the plastic container"
> By Becky Manning on March 9, 2021.

171.   On April 15, 2021, Amazon user "Jane" reported that Defendants had falsely advertised a product they sold through their Amazon Storefront and she "[w]ill never buy from you again."

> ★☆☆☆☆   "You need to correct your picture and only show 1 toothbrush. Not the 4 in the ad. Will never buy from you again."
> By Jane on April 15, 2021.

172.   On March 10, 2021, Amazon users "paul and Kathy" reported that Defendants sent the "wrong item" and then "tried to charge us for return shipping."   They explained that they ultimately had to contact Amazon because Defendants "would not contact us and then did not give us a full refund."

> *"Seller sent us wrong item and tried to charge us for return shipping. We had to contact Amazon because seller would not contact us and then did not give us a full refund. Thank you Amazon for your support, you did a great job."*
> Read less
> By paul and kathy on March 10, 2021.

173.   On May 10, 2021, Amazon user "Cresta" reported that Defendants' Amazon Storefront was an "[a]ppallingly bad seller with zero regard for customers.   Deliberately misrepresented details of unfulfilled order."

> *"Appallingly bad seller with zero regard for customers. Deliberately misrepresented details of unfulfilled order."*
> By Cresta on May 10, 2021.

174.   On February 27, 2021, Amazon user "Christy" reported that, after she purchased a pet medicine product from Defendants' Amazon Storefront, she received a product that was "not sealed at all" even though it was advertised as new.   Although Amazon added a comment stating that it takes "responsibility" for the "fulfillment experience" described in the review, the issue the consumer complained about is clearly the fault of Defendants rather than a fulfillment problem, such as delivering a product late or to the wrong address, that could be attributable to Amazon rather than Defendants:

> *"Item was not sealed at all, but claimed to be new. How can I trust what I'm giving to my animals, when medicine isn't sealed? Not happy at all.*
> By Christy on February 27, 2021.
> **Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

175.   The foregoing reviews are only a sample of the negative reviews customers have written about Defendants' eBay Storefront, Walmart Storefront, and Amazon Storefront. Additional other customers have complained of receiving products from Defendants that were damaged, defective, tampered with, previously used, improperly packaged, or of otherwise poor quality.

176.   These complaints about Defendants are typical of the complaints made about products sold and customer service provided by unauthorized sellers on online marketplaces.

KONG allows its products to be sold only by Authorized Sellers, who are subject to and must follow the quality-control and customer-service requirements in the KONG Rules, to prevent customers who purchase KONG products from suffering experiences like those described in the above complaints about Defendants.

### Defendants Do Not Abide by, and Interfere With, KONG's Quality Controls and Customer-Service Requirements

177. Defendants do not abide by KONG's quality-control and customer-service requirements that KONG requires Authorized Sellers to follow.

178. Defendants do not comply with KONG's quality-control requirements because they sell on Amazon, eBay, and Walmart without KONG's authorization or oversight.

179. Defendants also do not comply with KONG's quality-control requirements—and interfere with KONG's quality controls—because they have not disclosed to KONG where they acquire products that bear the KONG Trademarks and have not given KONG the right to audit and inspect their facilities and records.  As a result, KONG cannot determine if any products Defendants are selling or have sold are subject to a recall or consumer-safety information effort, and it also cannot obtain Defendants' assistance with any recall or consumer-safety information efforts that may arise related to any products they are selling or have sold in the past.

180. Customer reviews of Defendants' eBay Storefront, Walmart Storefront, and Amazon Storefront show that Defendants have sold products—including products bearing the KONG Trademarks—that are damaged, defective, counterfeit, tampered with, previously used, improperly packaged, different from what customers had ordered, or of otherwise poor quality. *See, e.g., supra* ¶¶ 164-175.  Accordingly, upon information and belief, Defendants are: (1) failing to comply with KONG's quality-control requirements that prohibit Authorized Sellers from

tampering with, altering, modifying, or relabeling products bearing the KONG Trademarks; (2) failing to comply with KONG's quality-control requirements that prohibit Authorized Online Sellers from allowing products to receive previously-returned, repackaged, or otherwise altered products when they purchase products advertised as "new"; and (3) failing to comply with the quality-control inspection requirements that KONG requires Authorized Sellers to follow and not removing damaged, defective, counterfeit, or other poor-quality products bearing the KONG Trademarks from their inventory.  Instead, Defendants are selling products bearing the KONG Trademarks that are damaged, defective, counterfeit, tampered with, previously used, improperly packaged, or of otherwise poor quality.  These sales cause customers to write highly negative reviews of KONG products in which they complain of receiving poor quality products, which harm KONG's reputation and hurt the placement of KONG products in search results.

181.    Defendants do not comply with KONG's quality-control requirements with respect to storage conditions because, upon information and belief, Defendants do not warehouse their products in a cool, dry place, away from direct sunlight, extreme heat, and dampness.  As a result, upon information and belief, Defendants sell products bearing the KONG Trademarks that have poor durability and other defects resulting from poor storage.

182.    Defendants do not comply with KONG's quality-control requirements with respect to storage conditions and fulfillment services because they store some of their products at Amazon fulfillment centers and, upon information and belief, allow their inventory to be commingled by Amazon with other sellers' inventories.  As a result, customers may receive products from other sellers' inventories when they purport to purchase products from Defendants' Amazon Storefront.  Further, even if Defendants were to implement quality-assurance procedures comparable to those

49

KONG requires of Authorized Sellers, Defendants would have no way to ensure that their products are those actually being shipped to customers in fulfillment of their orders.

183. Defendants' failure to abide by the KONG Rules prevents KONG from exercising control over the quality of products Defendants sell bearing the KONG Trademarks. KONG cannot audit Defendants to ensure they are complying with KONG's quality controls or close Defendants' account for failing to comply with KONG's quality-control requirements.

184. Defendants' failure to comply with the KONG Rules also interferes with KONG's quality controls because, unlike with its Authorized Online Sellers that KONG is able to monitor through monthly test purchases and other auditing actions, KONG cannot take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

185. Because Defendants have not agreed to comply with KONG's quality-control requirements, including its audit procedures, KONG has no way to confirm that Defendants are qualified or trained to accurately describe, demonstrate, and sell the products bearing the KONG Trademarks in their inventory, or to advise customers on how to use KONG products safely and properly. Accordingly, Defendants may not provide the informed customer service regarding KONG products that KONG requires Authorized Sellers to provide.

186. Customer reviews of Defendants' Amazon storefront show that Defendants have provided poor customer service, including misrepresenting products and details of customers' orders and selling products bearing the KONG Trademarks that were defective or of otherwise poor quality. *See, e.g.*, *supra* ¶¶ 164163-175. Accordingly, upon information and belief, Defendants are not providing the ongoing support, advice, and responses to customer inquiries that KONG requires its Authorized Sellers to provide to customers who purchase KONG products.

187.    Because Defendants have not agreed to comply with KONG's quality-control requirements, including its audit procedures, KONG has no way to confirm that Defendants take appropriate steps to address negative reviews from customers.  Defendants do not cooperate with KONG in investigating negative product reviews as Authorized Sellers are required to do.

**Defendants Are Infringing the KONG Trademarks by Selling Products Bearing the KONG Trademarks That Are Not Subject to, Do Not Abide by, and Interfere with KONG's Quality Controls and Customer-Service Requirements**

188.    For all of the reasons set forth above, the products Defendants sell bearing the KONG Trademarks fail to adhere to the extensive and legitimate quality controls that KONG exercises over products bearing the KONG Trademarks to protect consumers and its brand goodwill.

189.    The products sold by Defendants bearing the KONG Trademarks are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements.

190.    Because the products Defendants sell are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements, those products are materially different from genuine KONG products.

191.    Because the products Defendants sell are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements, the products Defendants sell are not genuine KONG products.

192.    Defendants' unauthorized sale of products bearing the KONG Trademarks is likely to, and does, create consumer confusion because consumers who purchase products from Defendants believe they are purchasing genuine KONG products when, in fact, they are not.

51

193.    Defendants' unauthorized sale of products bearing the KONG Trademarks infringes the KONG Trademarks and diminishes their value.

194.    Despite these facts, Defendants have sold, and continue to sell, products bearing the KONG Trademarks without KONG's consent.

**Defendants Are Infringing the KONG Trademarks by Selling Products Bearing the KONG Trademarks That Do Not Come with the Satisfaction Guarantee**

195.    As set forth above, genuine KONG toy or treat products that are purchased from Authorized Sellers come with KONG's Satisfaction Guarantee.  KONG, however, does not provide the Satisfaction Guarantee for products purchased from any seller who is not an Authorized Seller because KONG cannot ensure the quality of products sold by sellers that are not subject to KONG's quality controls.

196.    Because Defendants are not Authorized Sellers and, thus, are not subject to KONG's quality control requirements, the products they sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee.

197.    Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine KONG products.

198.    Defendants' unauthorized sale of products bearing the KONG Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine KONG products that come with the Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Falsely Representing That the
Products They Sell Come with the Satisfaction Guarantee**

199.    In addition to infringing the KONG Trademarks, Defendants are also falsely advertising that the products they sell come with the Satisfaction Guarantee

52

200.    Defendants are selling products bearing the KONG Trademarks on Amazon product listings that state the products are covered by the Satisfaction Guarantee.  For example, Defendants have listed the following product that specifically states that it comes with the Satisfaction Guarantee:



201.    As set forth above, the products Defendants sell do not come with the Satisfaction Guarantee.  Thus, by representing to consumers that the products they sell come with the Satisfaction Guarantee, Defendants are falsely advertising the products they are selling.

**Defendants Are Tortiously Interfering with KONG's Agreements and Business Relationships with its Authorized Sellers**

202.    KONG sells KONG products only to Authorized Sellers.

203.    Defendants are not Authorized Sellers, and have sold a high volume of products bearing the KONG Trademarks through their Amazon Storefront, eBay Storefront, Walmart Storefront, and the Piccard's Pets Website.

204.    Although KONG must take discovery in this action to learn how Defendants acquired the products bearing KONG Trademarks that they have resold, based on these facts it is exceedingly likely that Defendants have obtained those products from one or more Authorized Sellers.

205.    Upon information and belief, Defendants have purchased products from KONG's Authorized Sellers for the purpose of reselling the products on the Internet without KONG's approval, with full knowledge that such behavior would unlawfully infringe upon the KONG Trademarks.

206.    KONG's agreements with its Authorized Sellers prohibit Authorized Sellers from selling KONG products to third parties, like Defendants, who are not Authorized Sellers and who intend to resell the products.

207.    Defendants were informed of this prohibition by at least March 2019.  In that month, Martinez entered into a sell-through agreement with KONG that prohibited Defendants from acquiring any KONG products for the purpose of resale on any online marketplace.

208.    On or around February 8, 2021 Defendants also received a cease-and-desist letter from KONG informing them that the contracts between KONG and its Authorized Sellers prohibit Authorized Sellers from selling KONG products to any person or entity that, like Defendants, is not an Authorized Seller and intends to resell the products.  KONG's letter also informed Defendants that: (i) by purchasing KONG products from an Authorized Seller for purposes of resale, they were causing a breach of the agreement between KONG and its Authorized Seller and were interfering with KONG's agreements and business relationships; and (ii) if they continued to acquire products from KONG's Authorized Sellers for the purpose of reselling them, they would be liable for tortuously interfering with KONG's contracts and/or business relationships.

209.  Despite having knowledge of KONG's contracts with its Authorized Sellers and their terms, upon information and belief, Defendants have continued to acquire products from KONG's Authorized Sellers with the intent to resell them.

210.  Upon information and belief, Defendants willfully and knowingly induced, and are continuing to induce, unknown Authorized Sellers to breach their agreements with KONG so they can acquire products bearing the KONG Trademarks and unlawfully infringe upon the KONG Trademarks by reselling the products.

### KONG Has Suffered Significant Harm as a Result of Defendant's Conduct

211.  As set forth above, the unauthorized sale of products bearing the KONG Trademarks through unauthorized sellers, such as Defendants, has caused significant harm to the KONG brand.

212.  When a consumer receives from Defendants a non-genuine, poor-quality, or defective product that does not come with the Satisfaction Guarantee, the consumer associates that negative experience with KONG.  The consumer may also leave a negative review on a KONG product page.  For these reasons, Defendants' ongoing sale of unauthorized products bearing the KONG Trademarks harms the KONG brand.

213.  KONG has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions, including, but not limited to, loss of sales, damage to its intellectual property and damage to its existing and potential business relations.

214.  KONG has suffered, and will continue to suffer, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

215.  KONG is entitled to injunctive relief because, upon information and belief, Defendants will otherwise continue to sell products bearing the KONG Trademarks unlawfully

and infringe the KONG Trademarks, causing continued irreparable harm to KONG 's reputation, goodwill, relationships, intellectual property, and brand integrity.

216. Defendants' conduct was and is knowing, intentional, willful, malicious, wanton, and contrary to law.

217. Defendants' willful infringement of the KONG Trademarks and continued pattern of misconduct demonstrate an intent to harm KONG.

### FIRST CAUSE OF ACTION
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**

218. KONG re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

219. KONG owns the KONG Trademarks.

220. KONG has registered the KONG Trademarks with the United States Patent and Trademark Office.

221. The KONG Trademarks are valid and subsisting trademarks in full force and effect.

222. Defendants willfully and knowingly used, and continue to use, the KONG Trademarks in interstate commerce for the purpose of selling products bearing the KONG Trademarks without KONG's consent.

223. The products Defendants sell bearing the KONG Trademarks are not authorized for sale by KONG.

224. The products Defendants sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee.

225. KONG has established legitimate and substantial quality-control procedures with which genuine KONG products must comply.

56

226.    KONG abides by these quality control procedures and requires all of its Authorized Sellers to abide by these quality controls.

227.    KONG's quality controls are legitimate and material, as they protect consumers and prevent consumers from receiving poor-quality products that could harm them.  When a consumer considers whether to purchase a product bearing the KONG Trademarks, the applicability of KONG's quality controls to the product is relevant to the consumers' purchasing decision.

228.    The products Defendants sell bearing the KONG Trademarks are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements.

229.    Because the products Defendants sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements, the products Defendants sell are materially different from KONG products sold by Authorized Sellers.

230.    Because the products Defendants sell bearing the KONG Trademarks are materially different from KONG products sold by Authorized Sellers, the products Defendants sell are not genuine KONG products.

231.    Defendants' unauthorized sale of products bearing the KONG Trademarks interferes with KONG's quality controls and ability to exercise quality control over products bearing the KONG Trademarks.

232.    Defendants' unauthorized advertisement and sale of products bearing the KONG Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer are covered by the Satisfaction Guarantee and are subject to and abide by KONG's quality controls when, in fact, they are not.

233.    Defendants' unauthorized sale of products bearing the KONG Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the KONG Trademarks suggests that the products Defendants offer for sale are genuine KONG products when, in fact, they are not.

234.    Defendants' unauthorized sale of products bearing the KONG Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the KONG Trademarks suggests that the products Defendants offer for sale are sponsored or authorized by KONG when, in fact, they are not.

235.    Defendants' unauthorized use of the KONG Trademarks has infringed and materially damaged the value of the KONG Trademarks and caused significant damage to KONG's business relationships.

236.    As a proximate result of Defendants' actions, KONG has suffered, and continues to suffer, immediate and irreparable harm.  KONG has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will permanently remain on Amazon and other online marketplaces, harming KONG's reputation among consumers and the placement of its products in search results.

237.    KONG is entitled to recover its damages caused by Defendants' infringement of the KONG Trademarks and disgorge Defendants' profits from Defendants' willfully infringing sales and unjust enrichment.

238.   KONG is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, KONG will suffer irreparable harm.

239.   KONG is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed the KONG Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition
### 15 U.S.C. § 1125(a)(1)(A)

240.   KONG re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

241.   KONG is the owner of the KONG Trademarks.

242.   Defendants have willfully and knowingly used, and continue to use, the KONG Trademarks in interstate commerce for purposes of selling products bearing the KONG Trademarks without KONG's consent.

243.   The products Defendants advertise and sell bearing the KONG Trademarks are not authorized for sale by KONG.

244.   KONG has established and implemented legitimate and substantial quality controls with which genuine KONG products must comply.

245.   KONG abides by these quality controls and requires all of its Authorized Sellers to abide by these quality controls.

246.   KONG's quality controls are material, as they protect consumers and prevent them from receiving poor-quality, damaged, and defective products.

247.    The products Defendants advertise and sell bearing the KONG Trademarks are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements.

248.    Because the products Defendants advertise and sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements, the products Defendants sell are materially different from genuine KONG products.

249.    Because the products Defendants advertise and sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements, the products Defendants advertise and sell are not genuine KONG products.

250.    Defendants' unauthorized advertisement and sale of products bearing the KONG Trademarks interferes with KONG's quality controls and its ability to exercise quality control over products bearing the KONG Trademarks.

251.    Defendants' unauthorized advertisement and sale of products bearing the KONG Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer are covered by the Satisfaction Guarantee and are subject to and abide by KONG's quality controls when, in fact, they are not.

252.    Defendants' unauthorized advertisement and sale of products bearing the KONG Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants advertise and offer for sale are genuine KONG products when, in fact, they are not.

60

253.     Defendants' unauthorized advertisement and sale of products bearing the KONG Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants advertise and offer for sale are sponsored by, authorized by, or otherwise connected with KONG when, in fact, they are not.

254.     Defendants' unauthorized use of the KONG Trademarks has infringed upon and materially damaged the value of the KONG Trademarks and caused significant damage to KONG's business relationships.

255.     As a result of Defendants' conduct, KONG has suffered, and continues to suffer, immediate and irreparable harm.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will permanently remain on Amazon and other online marketplaces, harming KONG's reputation among consumers and its placement in search results.

256.     KONG has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

257.     KONG is entitled to recover its damages caused by Defendants' infringement of the KONG Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

258.     KONG is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, KONG will suffer irreparable harm.

259.     KONG is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

### THIRD CAUSE OF ACTION
**False Advertising**
**15 U.S.C. § 1125(a)(1)(B)**

260.   KONG re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

261.   KONG owns the KONG Trademarks.

262.   KONG has registered the KONG Trademarks with the United States Patent and Trademark Office.

263.   The KONG Trademarks are valid and subsisting trademarks in full force and effect.

264.   Through their Amazon Storefront, Defendants have willfully and knowingly used, and continue to use, the KONG Trademarks in interstate commerce for purposes of advertising, promoting, and selling products bearing the KONG Trademarks without KONG's consent.

265.   Defendants' advertisements and promotions of their products unlawfully using the KONG Trademarks have been disseminated to the relevant purchasing public.

266.   KONG products purchased from KONG's Authorized Sellers, who comply with KONG's quality controls, come with the Satisfaction Guarantee.

267.   KONG cannot oversee or take action to correct the quality of its products sold by unauthorized sellers.  As a result, KONG does not extend its Satisfaction Guarantee to products that are sold by unauthorized sellers who are outside of and do not comply with KONG's quality controls.  Accordingly, the products Defendants sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee.

268.   Defendants falsely advertise that the products they sell bearing the KONG Trademarks come with the Satisfaction Guarantee.  As discussed above, the product listings on

which Defendants sell products bearing the KONG Trademarks specifically state that they come with the Satisfaction Guarantee.

269.    This representation is false because the products Defendants sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee.

270.    Defendants' use of the KONG Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the KONG Trademarks misrepresents the nature, characteristics, qualities, and origin of the products because it suggests that they come with the KONG when, in fact, they do not.

271.    As a proximate result of Defendants' actions, KONG has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

272.    KONG is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, KONG will suffer irreparable harm.

273.    KONG is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in false advertising.

**FOURTH CAUSE OF ACTION**
**Trademark Dilution**
**15 U.S.C. § 1125(c)**

274.    KONG re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

275.   Products bearing the KONG ® trademark have been sold to the public since 1976. For 45 years, KONG has been recognized by consumers as the source of high quality pet products bearing the KONG® trademark.

276.   The KONG® trademark was first filed with the United States Patent and Trademark Office in 1986, and was registered in 1987.  Since that time, the KONG® trademark has been filed and registered with respect to numerous categories of goods.

277.   KONG is the owner of the KONG® trademark, and has registered the trademark with the United States Patent and Trademark Office.

278.   The KONG® trademark is valid, subsisting, and in full force and effect.

279.   KONG has expended substantial time, effort, money, and resources advertising and promoting products under the KONG® trademark.  As a result of KONG's efforts, the KONG® trademark is the means by which KONG products are distinguished from others in the marketplace.

280.   KONG markets, advertises, and sells products bearing the KONG® trademark throughout the United States.

281.   KONG has implemented legitimate and substantial quality controls that it requires all Authorized Sellers to follow to protect the KONG name and brand.

282.   Consumers throughout the United States recognize and associate the KONG name with quality.

283.   Because of the quality, durability, and dependability of KONG products and KONG's use of the KONG® trademark, consumers trust the KONG name and KONG products.

284.   The KONG® trademark is inherently distinctive, and as a result of KONG'S long and continuous use of the KONG® trademark, it has acquired a secondary meaning associated by purchasers and the public with KONG's products.

64

22938377.1

285.    KONG is widely recognized by the general consuming public as the designated source of goods bearing the KONG® trademark.

286.    For these reasons, since at least 2005 the KONG® trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

287.    After the KONG® trademark became famous, beginning in or around 2018, Defendants have willfully used the KONG® trademark in connection with the unauthorized and illegal sale of products.

288.    Because the products sold by Defendants do not come with the Satisfaction Guarantee and are not subject to and do not abide by KONG's quality controls, consumers who purchase products from Defendants are more likely to receive a damaged, defective, or otherwise poor quality product and have an unsatisfactory customer experience.  Numerous customers have complained about receiving poor quality products from Defendants, and have also complained about Defendants' customer service.

289.    Consumers who receive poor quality products that do not come with the Satisfaction Guarantee or customer service provided by Authorized Sellers are likely to associate that negative experience with KONG and the KONG® trademark.  As a result, Defendants' unauthorized and willful use of the KONG® trademark is tarnishing and diluting the value and distinctive quality of the KONG® trademark.

290.    Defendants' unlawful actions have harmed the reputation and goodwill associated with the KONG® trademark, and KONG has suffered and will continue to suffer immediate and irreparable injury.  Further, Defendants' actions have harmed and will continue to harm consumers interested in purchasing genuine KONG products.

22938377.1

291.     As a proximate result of Defendants' actions, KONG has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

292.     KONG is entitled to recover its damages caused by Defendants' dilution of the KONG® trademark and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

293.     KONG is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, KONG will suffer irreparable harm.

294.     KONG is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith diluted the KONG® trademark.

### FIFTH CAUSE OF ACTION
**Common Law Trademark Infringement and Unfair Competition**

295.     KONG re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

296.     KONG owns the KONG Trademarks.

297.     The KONG Trademarks are valid and subsisting trademarks in full force and effect.

298.     The KONG Trademarks are distinctive and widely recognized by the consuming public.   KONG's products are sold and purchased through its website and its network of Authorized Sellers throughout the United States, including Colorado.

299.     KONG is widely recognized as the designated source of goods bearing the KONG Trademarks.

300.     Defendants willfully and knowingly used, and continue to use, the KONG Trademarks in commerce for purposes of selling products bearing the KONG Trademarks in Colorado without KONG's consent.

301.     The products Defendants sell bearing the KONG Trademarks are not authorized for sale by KONG.

302.     The products Defendants sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee

303.     KONG has established legitimate and substantial quality-control procedures over KONG products.

304.     KONG abides by these quality-control procedures and requires all Authorized Sellers to abide by them as well.

305.     KONG's quality controls are material, as they protect consumers and prevent them from receiving poor-quality products that could harm them.  When a consumer considers whether to purchase a product bearing the KONG Trademarks, the applicability of KONG's quality controls to the product is relevant to the consumer's purchasing decision.

306.     The products Defendants sell bearing the KONG Trademarks are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements.

307.     Because the products Defendants sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements, the products Defendants sell are materially different from genuine KONG products sold by Authorized Sellers.

67

308.     Because the products Defendants sell bearing the KONG Trademarks are materially different from KONG products sold by Authorized Sellers, the products Defendants sell are not genuine KONG products.

309.     Defendants' unauthorized sale of products bearing the KONG Trademarks interferes with KONG's quality controls and its ability to exercise quality control over products bearing the KONG s Trademarks.

310.     Defendants' unauthorized advertisement and sale of products bearing the KONG Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer are covered by the Satisfaction Guarantee and are subject to and abide by KONG's quality controls when, in fact, they are not.

311.     Defendants' unauthorized sale of products bearing the KONG Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the KONG Trademarks suggests that the products Defendants offer for sale are genuine KONG products when, in fact, they are not.

312.     Defendants' unauthorized sale of products bearing the KONG Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the KONG Trademarks suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with KONG when, in fact, they are not.

313.     Defendants' knowing and willful use of the KONG Trademarks in connection with the unauthorized and illegal sale of products bearing the KONG Trademarks infringes the KONG Trademarks and is contrary to honest practice in industrial and commercial matters.

314.    Defendants' unauthorized use of the KONG Trademarks has infringed upon and materially damaged the value of the KONG Trademarks, caused significant damage to KONG's business relations, and infringed the KONG Trademarks.

315.    As a result of Defendants' conduct, KONG has suffered, and continues to suffer, immediate and irreparable harm.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will permanently remain on Amazon and other online marketplaces, harming KONG's reputation among consumers and its placement in search results.

316.    KONG has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

317.    KONG is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

### SIXTH CAUSE OF ACTION
**Deceptive Trade Practices**
**C.R.S. § 6-1-105**

318.    KONG re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

319.    KONG owns the KONG Trademarks.

320.    The KONG Trademarks are valid and subsisting trademarks in full force and effect.

321.    Defendants willfully and knowingly used, and continue to use, the KONG Trademarks in interstate commerce, including through their product listings on Amazon, for the purpose of advertising, promoting, and selling products bearing the KONG Trademarks without the consent of KONG.

322.    Defendants' advertisements and promotions of products unlawfully using the KONG Trademarks have been disseminated to the relevant purchasing public.

323.    Defendants use the KONG Trademarks with the intent that consumers will rely on Defendants' use of the KONG Trademarks and believe that Defendants are selling genuine KONG products.

324.    The products Defendants advertise, promote, and sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee.

325.    KONG has established substantial quality-control procedures that genuine KONG products must comply with.

326.    KONG abides by these quality-control procedures and requires all Authorized Sellers to abide by them as well.

327.    KONG's quality controls are legitimate and material, as they protect consumers and prevent them from receiving poor-quality products that could harm them.  When a consumer considers whether to purchase a product bearing the KONG Trademarks, the applicability of KONG's quality controls to the product is relevant to the consumer's purchasing decision.

328.    The products Defendants advertise, promote, and sell bearing the KONG Trademarks are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements.

329.    Because the products Defendants advertise, promote, and sell bearing the KONG Trademarks do not come with the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with KONG's quality controls and customer-service requirements, the products Defendants sell are materially different from genuine KONG products sold by Authorized Sellers.

70

330.    Because the products Defendants advertise, promote, and sell bearing the KONG Trademarks are materially different from KONG products sold by Authorized Sellers, the products Defendants sell are not genuine KONG products.

331.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the KONG Trademarks interfere with KONG's quality controls and ability to exercise quality control over products bearing the KONG Trademarks.

332.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the KONG Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the KONG Trademarks suggests that the products Defendants offer for sale are covered by the Satisfaction Guarantee and are subject to, and abide by, KONG's quality controls when, in fact, they do not.

333.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the KONG Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the KONG Trademarks suggests that the products Defendants offer for sale are genuine KONG products when, in fact, they are not.

334.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the KONG Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the KONG Trademarks suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with KONG when, in fact, they are not.

335.    Defendants' unauthorized and deceptive use of the KONG Trademarks is material and likely to influence customers to purchase the products Defendants sell, as consumers are likely to believe that products Defendants advertise using the KONG Trademarks are genuine KONG

products that are subject to, and abide by, KONG's quality-control requirements and come with benefits associated with authentic KONG products when, in fact, they do not.

336.    Defendants' unauthorized use of the KONG Trademarks in advertising, and otherwise, infringes the KONG Trademarks.

337.    Defendants' use of the KONG Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the KONG Trademarks is a deceptive trade practice under C.R.S. § 6-1-105.

338.    As a result of Defendants' conduct, KONG has suffered, and continues to suffer, immediate and irreparable harm.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will permanently remain on Amazon and other online marketplaces, harming KONG's reputation among consumers and its placement in search results.

339.    KONG has also suffered, and continues to suffer, damages, including but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

340.    Pursuant to C.R.S. § 6-1-113, KONG is entitled to an injunction enjoining Defendants' unlawful conduct, and an award of treble damages and attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
**Intentional Interference with Existing and/or Prospective Contract and Business Relations**

341.    KONG re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

342.    KONG sells KONG products only to Authorized Sellers.  KONG has not sold any KONG products to Defendants.

72

343.     KONG has entered into agreements with its Authorized Sellers to sell KONG products.  These agreements specifically prohibit Authorized Sellers from selling KONG products to third parties, such as Defendants, who are not Authorized Sellers and who intend to resell the products.

344.     Defendants have sold—and continue to sell—a high volume of products bearing the KONG Trademarks through their Amazon Storefront, eBay Storefront, Walmart Storefront, and the Piccard's Pets Website.

345.     Based on these facts, it is plausible and a reasonable inference that Defendants have purchased the products they are selling, and have resold, from one or more of KONG's Authorized Sellers.

346.     Defendants know that KONG's agreements with its Authorized Sellers prohibit Authorized Sellers from selling KONG products to anyone who, such as Defendants, is not an Authorized Seller and intends to resell the products.

347.     Defendants had notice of this prohibition at the latest on or around March 2019, when they entered into a sell-through agreement with KONG, and again on or around February 8, 2021, through a cease-and-desist letter they received from KONG.

348.     Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with KONG's agreements with its Authorized Sellers by inducing the Authorized Sellers to breach their agreements and sell products to Defendants so they could unlawfully resell them through online marketplaces on the Internet.

349.     After being notified of this prohibition, Defendants intentionally induced one or more of KONG's Authorized Sellers to breach their agreements with KONG by continuing to acquire products from KONG's Authorized Sellers for the purpose of selling them on the Internet.

350.     Defendants acted with a wrongful purpose and employed wrongful means by acquiring KONG products for the purpose of reselling those products on the Internet in violation of KONG's agreements with its Authorized Sellers.  Specifically, Defendants induced Authorized Sellers to breach their agreements with KONG so that Defendants could unlawfully infringe upon and materially damage the value of the KONG Trademarks by reselling the products they obtained from Authorized Sellers on the Internet.

351.     Because Defendants have refused to disclose how they have obtained the products bearing the KONG Trademarks they have resold, KONG must take discovery in this action to learn the specific identities of all the Authorized Sellers that sold products to Defendants.  Defendants, however, know the sources of the KONG products they have obtained and the basis for KONG's claim of tortious interference.  KONG's agreements with its Authorized Sellers are a specific class of contract that Defendants caused Authorized Sellers to breach when they purchased products from Authorized Sellers for resale.

352.     Defendants' actions have caused injury to KONG for which KONG is entitled to compensatory damages in an amount to be proven at trial.

353.     The injury to KONG is immediate and irreparable, as KONG's reputation and relationships have been damaged among both its consumers and Authorized Sellers.

354.     KONG is also entitled to punitive damages because Defendants acted with actual malice and accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## EIGHTH CAUSE OF ACTION
**Breach of Contract**

355. KONG re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

356. Martinez entered into a valid and enforceable contract with KONG.

357. KONG has performed all of its obligations under the contract.

358. Martinez has breached his contract with KONG by: (1) continuing to sell KONG products through online marketplaces, including Amazon, eBay, and Walmart; and (2) continuing to purchase or otherwise acquire KONG products for the purpose of reselling them on online marketplaces.

359. Martinez has not cured these breaches and continues to breach his contract with KONG.

360. Martinez has no legal excuse for failing to perform his obligations under the contract.

361. As a proximate result of Martinez's breaches of his contract, KONG has suffered damages including loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

362. The contract provides that, in the event of breach, Martinez will be responsible for paying the attorneys' fees that KONG incurs in enforcing the contract. Accordingly, KONG is entitled to recover its reasonable costs, expenses, and attorneys' fees incurred in enforcing its rights and obligations under the contract and bringing this action.

## PRAYER FOR RELIEF

WHEREFORE, KONG prays for relief and judgment as follows:

22938377.1

A.      Judgment in favor of KONG and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.      Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

       i)      Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all KONG products;

      ii)      Prohibiting the Enjoined Parties from using any of the KONG Trademarks in any manner, including advertising on the Internet,

     iii)      Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all KONG products as well as any products bearing any of the KONG Trademarks;

     iv)      Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the KONG Trademarks, including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

76

v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites and online storefronts any reference to any of the KONG products, or any of the KONG Trademarks;

vi)     Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the KONG Trademarks which associate the KONG products or the KONG Trademarks with the Enjoined Parties or the Enjoined Parties' websites or storefronts;

vii)    Requiring the Enjoined Parties to take all action to remove unauthorized KONG Trademarks from the Internet, including from the websites www.amazon.com, www.ebay.com, www.walmart.com, and www.piccardmeds4pets.com; and

viii)   Requiring Defendants to destroy or return to KONG all products bearing the KONG Trademarks in their possession, custody, or control.

C.      An award of attorneys' fees, costs, and expenses; and

D.      Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

KONG demands a trial by jury on all claims and issues so triable.

Dated: July 28, 2021                           Respectfully submitted,

*/s/ Martha L. Fitzgerald*
Martha L. Fitzgerald
BROWNSTEIN HYATT FABER SCHRECK, LLP
410 Seventeenth Street, Suite 200
Denver, CO 80202-4432
Telephone:  (303) 223-1472
Email:  mfitzgerald@bhfs.com

77

William D. Kloss, Jr. (Ohio Bar No. 0040854)
Daniel C. Wucherer (Ohio Bar No. 0097210)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio  43215
Telephone:  (614) 464-6360
Email:  wdklossjr@vorys.com
          dcwucherer@vorys.com

*Counsel for Plaintiff The Kong Company, LLC*

22938377.1